Filed 4/1/22  M.M. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

<table>
<tr><td>

M.M.,

    Petitioner,

v.

THE SUPERIOR COURT OF TUOLUMNE COUNTY,

    Respondent;

TUOLUMNE COUNTY DEPARTMENT OF SOCIAL SERVICES,

    Real Party in Interest.

</td><td>

F083720

(Super. Ct. No. JV8254)


**OPINION**

</td></tr>
</table>

### THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Frank Dougherty, Judge.  (Retired Judge of the Merced Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

M.M., in pro. per., for Petitioner.

No appearance for Respondent.

Sarah Carrillo, County Counsel, and Maria Sullivan, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]    Before Meehan, Acting P. J., Snauffer, J. and DeSantos, J.

Petitioner, M.M. (mother), in propria persona, seeks an extraordinary writ (California Rules of Court, rule 8.452)[1] from the juvenile court's orders issued at a contested disposition hearing denying her reunification services on multiple statutory grounds, including Welfare and Institutions Code section 361.5, subdivision (b)(5),[2] and setting a section 366.26 hearing as to her daughter S.R. (the child). Mother contends the juvenile court erred by failing to provide her reunification services and requests the juvenile court be directed to order reunification services to her. We find no error in the juvenile court's orders and deny the petition.

**FACTUAL AND PROCEDURAL BACKGROUND**

On June 11, 2021, at approximately 3:15 p.m., mother and the child's father, C.R. (father), took the child, at seven months old, to a pediatrician because she was dragging her swollen left leg while crawling. The pediatrician recommended that she be taken to the emergency department at a local hospital for X-rays. An X-ray of the child's left leg revealed a fractured femur, which eventually resulted in a report of child abuse to the Tuolumne County Department of Social Services (department) and the Sonora Police Department.

Sergeant Johnson with the Sonora Police Department responded to the hospital at approximately 6:00 p.m., and he made contact with hospital staff. Johnson was informed by hospital staff that the parents could not remember any trauma events occurring to the child. Hospital staff indicated the injury would be deemed child abuse absent an explanation that the child was dropped with significant force. The femur is the strongest bone in the human body, and the parents provided no history of an event that would cause such a serious injury. The parents initially reported the child's difficulty crawling began two to three days prior, but they later claimed it could have been more than a week.

---

[1]     All further rule references are to the California Rules of Court.

[2]     All further statutory references are to the Welfare and Institutions Code.

2.

The hospital staff showed Johnson the X-ray of the child's lower left femur bone, which revealed a complete and displaced fracture. The hospital's radiologist believed the fracture was already two to three weeks old due to the bone's stage of healing. Johnson observed noticeable swelling to the child's left leg, but no other visible injuries were noted except for a yellow bruise on the child's face. The child had missed all pediatric appointments since a newborn checkup in December 2020. The hospital intended to transfer the child to Oakland Children's Hospital (OCH) for a complete workup to detect any additional injuries.

Next, Johnson made contact with mother and father in the child's hospital room. The parents reported that they were currently engaged, had been in a relationship for three years, and were the only ones living in the home with the child. They explained that mother worked night shifts while father worked day shifts to alternate their childcare responsibilities. Mother shared custody of her two other children, who are not subjects of this dependency proceeding, with a different father.

The parents explained that the child was slowing down with her crawling during the last week, and they noticed her leg was swelling within the last two days. The decision was made to take the child to a pediatrician when the child's leg was hard and swollen and unable to fully extend. They took the child to a pediatrician, who referred them to the hospital for blood work and X-rays to rule out a hip infection.

Father claimed they did not believe the leg could be broken because the child does not fuss or cry when her leg is washed in the bath. Mother stated her leg only appeared to cause pain when they tried to put her pants on the last two days. Both parents denied that they were aware of anything that could explain the injury to her leg. Mother did witness the child hit her face on her bouncer chair while she was crawling in the living room a few days prior, which caused the yellow bruising to her face. Upon further questioning by Johnson, mother offered that it was possible that one of her other children stepped on the child, but she never witnessed any such event.

The child was transferred by ambulance to OCH. At approximately 6:00 p.m. the following day, Johnson was informed by a social worker at OCH that the child also had a subacute fracture on her left tibia, buckle fracture on her right tibia, three broken ribs in her left back near her spine, and two broken ribs on her right side. It was noted as significant that the rib and leg fractures all appeared to be in different stages of healing. Johnson was informed by OCH staff that the child's older sibling would not be physically capable of causing injuries to such an extent.

On June 14, 2021, the investigating social worker and her supervisor met with J.M., the father of mother's other two children. J.M. explained that mother moved into her own apartment approximately three weeks earlier, and mother and father's relationship was " 'on and off.' " The child's paternal uncle, E.M., previously lived with mother, father, and the three children despite custody orders that E.M. was not to be around J.M.'s children. It was claimed that mother occasionally stayed at father's home, but mother had indicated that she was separating from father. J.M. also believed that E.M. lived with father.

The social worker's supervisor had knowledge that E.M. lost custody of his children in 2014 and served a prison term as a result of a conviction for child abuse. According to J.M., the parole terms of E.M. prevented him from being around children in general. J.M. agreed to seek full physical custody of his two children, and he would not allow the children to be around mother on an unsupervised basis as part of a safety plan.

Later that same date, department social workers met with a pediatric nurse practitioner from OCH because the child was almost ready to be discharged from the hospital. The nurse practitioner believed the three broken ribs on the child's left side were the oldest injuries at one to four weeks old. Rib injuries of such an age are typically caused by front to back or side to side compression, and they are caused by a " 'significantly forceful' " event.

4.

The parents were unable to provide the nurse practitioner with any moments the child could have been injured except for a sibling stepping on her leg. Both parents also denied that another adult lived with or provided care to the child besides two occasions that the child's maternal grandmother spent with the child. Ophthalmology results showed no signs of eye injury, and the child was pending testing for osteogenic imperfecta (brittle bone disease). The nurse practitioner indicated the injuries appeared to be nonaccidental and were " 'highly concerned for at least [three] traumatic events to cause the injuries.' "

The social workers proceeded to speak with father, who was outside of the child's room at OCH. Father reported that he only lived with mother, the child, and mother's two children, and he described mother as his fiancée. He acknowledged that his brother, E.M., lived with the family after his release from prison two years ago. However, he claimed E.M. moved out of the home approximately two months earlier. Father was aware of E.M.'s child abuse conviction, but he denied knowing specifics about the crime. E.M. left the home because mother and father indicated they wanted to spend more time with their own family.

Father admitted that he and mother left the child with E.M. when there was overlap between mother's and father's shifts or the parents had to go to the store. He denied having any concerns after E.M. provided care for the child. Father was unaware of the child's last medical appointment, but he was informed that a pediatrician at the child's doctor's office was known to report child abuse.

Mother joined the social worker's conversation with father by phone, and she claimed the child's fractured leg may have occurred after an older sibling stepped on her leg one week prior. Mother denied knowledge of the reason E.M. went to prison, and she struggled to answer when E.M. last lived with the family. Mother did not believe she needed to be worried that E.M. would harm the child, but she acknowledged that E.M. watched the child when the parents went to the store. Mother eventually admitted she

5.

had her own apartment, but she asserted father would move in after his current lease expired.  She also acknowledged that she moved into her own apartment with the children after she had an argument with E.M., and she was aware that E.M. was on parole.

After continued denials that E.M. was not living with father, father also admitted that E.M. still came by his home on occasion and watched the child when he went to the store.  Father admitted that he should have known better, and he stated something like this happens every time he is around his family.  The social workers explained to the parents that the child would be placed into protective custody while the investigation continued.  On June 14, 2021, a lieutenant with the Sonora Police Department signed an authorization to place the child into protective custody.

Later that same date, mother further explained that she moved out because she was afraid for herself and her children after E.M. got in her face and screamed at her.  Mother also suggested that E.M. was " 'in and out' " of father's home in Sonora.  She claimed that she moved out of father's home at the end of April 2021, and she also suggested that E.M. had not been around for a couple of weeks.  Mother became aware that E.M.'s parole terms prevented him from being around children when his parole officer came to their home while she was pregnant with the child.  After repeatedly denying that she was aware of the reason E.M. was on parole, she offered that she was told E.M.'s son was hurt by accident and E.M. was falsely accused.  The maternal aunt later explained that mother was well aware of the allegations that E.M. shook his newborn son before jumping on him while he was between a mattress and box spring.

The parents allowed E.M. to move back into their home when the child was two months old because E.M. was no longer on parole.  Mother did not believe that E.M. was a danger to her child, and she now claimed to remember an incident where one of her older children stepped on the child's leg.  Mother admitted to recent marijuana use, and

6.

she was described by the social worker as having a flat affect without showing any emotion.

On June 15, 2021, department social workers arrived at the hospital to pick up the child after she was discharged. Later that evening, Johnson went to father's home for follow up investigation. Father explained that he lived in the apartment for the last six years, and he allowed mother to move in when they started dating two years prior. The parents became engaged in September 2020, and he treated her other children like they were his own. In the last month, mother obtained her own apartment to have some space from father, but he claimed they both planned to move in to the new apartment eventually.

Father acknowledged that E.M. lived in their home for " 'a little bit' " and " 'it wasn't really a good idea.' " He was also aware of the allegations of child abuse against E.M., and he wished he looked into his brother's arrest with more detail. Father indicated that he wanted to answer Johnson's questions the right way, and he did not want to "burn" his brother.

The department filed an original petition alleging the child was described by section 300, subdivisions (a), (b)(1), and (e). The petition alleged the child suffered severe physical abuse by a person known to the parents, and the parents knew or reasonably should have known that the person was physically abusing the child. On June 22, 2021, the juvenile court ordered the child detained from mother's and father's custody, and it set a jurisdiction hearing for July 13, 2021.

The department's jurisdiction report detailed further conversation with mother regarding her living situation and the frequency that E.M. was in their home. Mother stated, " 'the whole reason [she] got an apartment was because [she] didn't want to be around [E.M.].' " She also claimed that father allowed E.M. to care for her children, but she did not. Mother stated that she lived in father's apartment with father and E.M. until Mother's Day weekend in May 2021.

In a separate conversation, father stated E.M. would watch the children for "a couple hours at a time" when they went to the store or on a date. Father claimed he and mother allowed E.M. to live in the home after E.M. was kicked out of his girlfriend's home. He also stated mother actually moved into her new apartment weeks before Mother's Day to be with the father of mother's other children.[3] Father was aware that mother was involved with other men and going out drinking since the child was removed from their home.

The argument that led to mother leaving the home started when E.M. stated, "[w]hile you guys are off working, I'm here watching your kids. I'm basically raising them." Father was aware that E.M. would drink alcohol with the intention of becoming intoxicated. Father recalled one time that he observed E.M. drinking while E.M. was home by himself with the children, and he also remembered E.M. pulling out a bag of methamphetamine while at the home. Father questioned whether E.M. dropped the child while E.M. was intoxicated, and he believed mother could have become aggravated when the child was crying and caused the injuries.

On July 12, 2021, a social worker discussed the child's status after a recent follow up appointment with the nurse practitioner at OCH. A bone survey confirmed the child had three separate fractures in her legs, and the two tibia fractures were described as " 'bucket handle fractures' " indicative of legs being pulled, yanked, or twisted. The child's six rib fractures were further along in healing, which indicated they were likely several weeks old. No medical problems contributed to the child's injuries, and the nurse practitioner believed it was clear that someone "violently physically assaulted" the child.

At the time of the jurisdiction hearing, the parents participated in supervised visits twice per week with no concerns noted. The jurisdiction hearing was continued to allow

---

**3** J.M. confirmed that he stayed the night at mother's new apartment in late May 2021.

the department to obtain the parents' cell phone communications from law enforcement and the child's medical records. On August 5, 2021, the department was informed that one of the child's older siblings stated, " 'Mommy hits me' " and "Mommy hits [younger sibling] too, and [the child], and [the child] cries and cries .…' " The sibling also demonstrated how he and the child were hit by flailing his arms.

On August 12, 2021, the department social workers met with each parent to discuss their cell phone communications from the weeks before the child's injuries. On May 5, 2021, E.M. sent messages to mother regarding his feelings for her and how she accepted him despite the fact that he was " 'using.' " E.M. also discussed his child abuse charges in detail while claiming that he only shook his son to stop him from choking.

Father confirmed from text messages that mother actually moved into her new apartment on May 22, 2021, which was two weeks after Mother's Day. He informed mother on May 30, 2021, that the child was having a " 'rough time,' " and he clarified that she would sometimes have trouble going to bed. The next day, father messaged mother that something was wrong with the child because she would not stop crying and it " 'just seems like her legs are hurting.' " On June 1, 2021, father told mother that the child had been up for the past two days, but he stated she was " 'getting better' " on the following date.

Four days later, father sent a video of the child dragging her legs while crawling, and he stated, " 'I do think we should take her in.' " Mother later responded that the child did not need to go to the hospital because she was crawling " 'just fine.' " On June 11, 2021, mother told a friend that she made a doctor's' appointment because the child's " 'leg hurts and I know it.' " On the date the child was removed, mother told father that he had to " 'step up for this one' " and that both parents would be in trouble for " 'letting [E.M.] around .…' "

After reviewing several of the messages with the social workers, father clarified that mother spent many nights out with friends after her night shifts at work, and she was

distant and short tempered while she was around the children. Father also acknowledged that he and mother used "whip-its"[4] while the grandmother watched the children, but mother claimed she only used them once despite her own text messages to the contrary. Mother told social workers that she did not believe the child needed to see a doctor because she thought the child was only experiencing growing pains.

On September 22, 2021, department social workers spoke with one of mother's former friends, B.G. B.G. observed mother as simply being in the room with the children as opposed to engaged with them like father. Mother's physical discipline of the child's oldest sibling was described as " 'chaos' " where mother repeatedly spanked the child over his clothes with an open hand. B.G. described mother is a " 'rage-ful' " person. B.G.'s significant other, J.F., added that he witnessed mother forcefully " 'snatch' " her children out of their cribs or " 'almost toss' " them into their cribs when she was upset with them.

The next day, the department social workers spoke with E.M. via telephone. E.M. denied having a lot of information about the parents' situation, but he was aware that the child was removed from their care. E.M. recalled going to the park with mother and the children, and he felt bad that he did more activities with mother and the children than father. E.M. claimed he was never alone with the child, and he stated mother never wanted to do anything in relation to parenting. He described mother's physical discipline as grabbing and slapping, and he did not believe mother was a safe parent. Mother reportedly told him during the parents' drive to OCH that the child was injured after she fell off the bed and her older sibling "ran over" her leg while running.

On September 28, 2021, the department social workers had a conversation with father about the programs he was participating in and his relationship with mother.

---

[4] Law enforcement recognized the term "whip-its" as an inhalant drug that individuals used to get " 'high.' "

Father denied ever using physical discipline on any of the children in the home. He denied telling E.M. to not speak with social workers, but he claimed he previously told the social workers about the child falling off the bed one morning. Father was aware that mother had resumed a relationship with a former boyfriend that previously involved domestic violence. The record of the conversation ends after he stated, " 'Maybe I was oblivious, but I guarantee I'm not anymore.' "

A contested jurisdiction hearing began on October 6, 2021, and the juvenile court gave a written ruling summarizing the evidence and discussing its reasoning on jurisdictional issues on November 2, 2021. The juvenile court found all of the allegations of the petition true, including findings under section 300, subdivision (e) that both parents knew or reasonably should have known that a person known to them was physically abusing the child. A disposition hearing was set for November 17, 2021.

The department's disposition report recommended that both parents be denied services pursuant to section 361.5, subdivision (b)(5) and (6) and the setting of a section 366.26 hearing. Mother was living on her own in her apartment, and she engaged in counseling for a couple of months before her therapist left the behavioral health agency. Mother attended her visits regularly, and she began her first parenting class on November 8, 2021. The child's injuries were healing appropriately and she no longer required a brace on her left leg.

The contested disposition hearing was set to begin on December 14, 2021. The detective assigned to investigate the child's injuries testified regarding the cell phone records that were subpoenaed in relation to the criminal investigation. The pediatric nurse practitioner from OCH who evaluated the child testified that the child's injuries could not be caused by either another child stepping on the leg or a fall from the bed. The child would be expected to have discomfort when her left leg was manipulated during clothing and diaper changes. At the time the child was injured, she would have exhibited very clear signs that she was seriously injured, such as screaming in pain.

11.

The assigned social worker who prepared the disposition report testified regarding the department's investigation and recommendations. Mother's counsel called two of her friends to testify as to their personal observations of mother's parenting style and abilities. One of her friends testified that mother showed her the child's red and swollen leg a few days before the child was taken to the doctor. Mother told her that the child's leg had been swollen for at least a day or two.

Mother testified that she believed the child was suffering from growing pains in late May 2021. She claimed the child never cried or fussed when her legs were manipulated during diaper changes, and she was crawling and happy during a video captured on May 28, 2021. Mother also testified that E.M. did live in the home for a period of time, and he would watch the children for 30 to 60 minutes at a time. Mother never asked E.M. if he hurt the child. She testified that she did not think it was wrong for him to watch the child despite her knowledge that he was not to be around children as a condition of his parole.

In father's testimony, he explained that he did not ask E.M. about the reason for his prison sentence because he did not want a confrontation before his brother moved in. He denied noticing that the child was in any pain except for fussiness while she was going to bed and her one-legged crawling. Father testified that E.M. watched the child for "a couple of hours" during the parents' shift changes or trips to the store.

The juvenile court gave its ruling on December 29, 2021, where it followed the department's recommendation to deny reunification services to mother and father pursuant to section 361.5, subdivision (b)(5) and (6). The juvenile court summarized the evidence and concluded that both parents were aware that the child was in distress as early as May 30, 2021. It found that both parents "knew [E.M.] had been convicted of child abuse, should not be around children, and was on parole for some period of time."

The juvenile court made an inference that mother was in a position to know the underlying factual basis for E.M.'s child abuse conviction because her sister dated father

for a significant amount of time. It further reasoned that there was "no doubt both parents consented to [E.M.]'s contact and care" of the child. Both parents were found to know that E.M. posed a danger to the child. After moving out of father's home, mother still dropped the child off at the apartment knowing that E.M. was present. Based on this evidence, the juvenile court found that the child's injuries were inflicted by either E.M., mother, or father, and both parents knew the child had been abused in the three weeks prior to her removal.

In determining whether reunification services would prevent reabuse of the child pursuant to section 361.5, subdivision (c)(3), the juvenile court considered how both parents were aware of E.M.'s lengthy prison sentence for child abuse, knew E.M. could not be around children, deceived law enforcement and OCH nursing staff, and "established they have not and will not protect [the child]." It did not believe that counseling on how to identify an unsafe person would prevent reabuse considering the parents' significant knowledge of the risk that E.M. posed to the child. The juvenile court concluded that reunification services would not prevent reabuse.

The juvenile court also found that various aspects of mother's and father's testimony were not credible, including statements that they were unaware of E.M.'s prior child abuse conviction, the child was not experiencing pain prior to the doctor visit, and they had no discussions with E.M. regarding the child's injuries. It made findings by clear and convincing evidence that the child was described by section 300, subdivision (e) because of the conduct of the parents, ordered the child removed from mother's and father's custody, denied reunification services to both parents, and set a section 366.26 hearing for April 18, 2022. Mother filed a timely notice of intent to file writ petition on January 3, 2022.

13.

## DISCUSSION

### *Relevant Legal Principles and Standard of Review*

As a general rule, when a child is removed from parental custody under the dependency laws, the juvenile court is required to provide reunification services to "the child and the child's mother and statutorily presumed father" (§ 361.5, subd. (a)). However, it is also the "intent of the Legislature, especially with regard to young children, … that the dependency process proceed with deliberate speed and without undue delay." (*Marlene M. v. Superior Court* (2000) 80 Cal.App.4th 1139, 1151.) Thus, the statutory scheme recognizes that there are cases in which the delay attributable to the provision of reunification services would be more detrimental to the minor than discounting the competing goal of family preservation. (*Ibid.*) Specifically, section 361.5, subdivision (b), exempts from reunification services "those parents who are unlikely to benefit" from such services or for whom reunification efforts are likely to be " 'fruitless.' " (*In re Joshua M.* (1998) 66 Cal.App.4th 458, 470, 474.)

The statutory sections authorizing denial of reunification services are sometimes referred to as "bypass" provisions. (*Melissa R. v. Superior Court* (2012) 207 Cal.App.4th 816, 821.) In the present case, the juvenile court denied reunification services to the parents based on two such bypass provisions, subdivision (b)(5) and (b)(6) of section 361.5. Since only one valid ground is necessary to uphold the juvenile court's bypass decision, we will focus here on section 361.5, subdivision (b)(5). (*Jennifer S. v. Superior Ct.* (2017) 15 Cal. App. 5th 1113, 1121.)

Section 361.5, subdivision (b)(5) permits the denial of reunification services when the juvenile court finds by clear and convincing evidence the "child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent." Thus, a denial under section 361.5, subdivision (b)(5) is predicated on a jurisdictional finding that the child is under the age of five and "has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or

14.

reasonably should have known that the person was physically abusing the child." (§ 300, subd. (e).) " '[S]evere physical abuse' " includes, as relevant here, "any single act of abuse that causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death[.]" (*Ibid.*)

On a challenge to the juvenile court's denial of reunification services, we apply the substantial evidence standard. We do so bearing in mind that the juvenile court's decision must be supported by clear and convincing evidence. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)

Once the juvenile court finds that the child is as described by section 361.5, subdivision (b)(5), the general rule favoring services no longer applies and the juvenile court is prohibited from ordering reunification services "unless it finds that, based on competent evidence, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd. (c)(3).) The parent bears the burden of proving that services would be likely to prevent reabuse. (*Raymond C. v. Superior Court* (1997) 55 Cal.App.4th 159, 163–164.)

### The Extraordinary Writ Petition

As a general proposition, a juvenile court's rulings are presumed correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) A parent seeking review of the juvenile court's orders from the setting hearing must, as mother did here, file an extraordinary writ petition in this court on Judicial Council form JV–825 to initiate writ proceedings. The purpose of such petitions is to allow the appellate court to achieve a substantive and meritorious review of the juvenile court's findings and orders issued at the setting hearing in advance of the section 366.26 hearing. (§ 366.26, subd. (*l*)(4)(A).)

Rule 8.452 sets forth the content requirements for an extraordinary writ petition. It requires the petitioner to set forth legal arguments with citation to the appellate record. (Rule 8.452(b).) In keeping with the dictate of rule 8.452(a)(1), we liberally construe

15.

writ petitions in favor of their adequacy recognizing that a parent representing himself or herself is not trained in the law. In this case, mother's petition states,

> "I do not believe the trial judge was accurate in his ruling.… It was clear from all the evidence that I was not the person who injured my child…. The trial judge had his decision already made, you can tell by the way it was written out. I believe an independent review will prove that I deserve a chance at services."

Mother's petition does not comply with the requirements of rule 8.452 in that it did not include a memorandum containing a summary of significant facts, citation to the record, or argument and citation to authority supporting the points raised. (Rule 8.452(b)(1)–(b)(3).) Nevertheless, in light of the mandate to liberally construe juvenile writ petitions (rule 8.452(a)(1)), we will exercise our discretion and construe the petition as a challenge to the juvenile court's decision to deny mother reunification services.

First, mother contends that she was not the person who injured her child, however, section 300, subdivision (e), and subdivision (b)(5) of section 361.5, do not require identification of the perpetrator. (*In re E.H.* (2003) 108 Cal.App.4th 659, 667, 670.) "Read together, those provisions permit denial of reunification services to either parent on a showing that a parent or someone known by a parent physically abused a minor. [Citation.] Thus, 'conduct' as it is used in section 361.5, subdivision (b)(5) refers to the parent in the household who knew or should have known of the abuse, whether or not that parent was the actual abuser." (*In re Kenneth M.* (2004) 123 Cal.App.4th 16, 21.) Here, the juvenile court did not rule out mother as a perpetrator, but the allegations of the petition and reasoning of the juvenile court acknowledged that it was the fact that mother knew or reasonably should have known that the child was being abused by a person known to her that supported its finding under section 361.5, subdivision (b)(5).

For comparison, in *L.Z. v. Superior Court* (2010) 188 Cal.App.4th 1285, the mother argued on appeal that the juvenile court erred in denying her reunification

16.

services because there was insufficient evidence she knew or reasonably should have known her baby was injured by abuse. The court agreed and reversed, noting that, as to the rib fractures, the parties stipulated that a person who had not caused them would not know the injuries existed and would just see a " 'fussy, crying baby.' " As to the fractured arm, the court stated that although the evidence demonstrated the mother was aware there was something wrong with the baby's arm, the child welfare agency had not proven that she should have known it "was caused by abuse." Thus, the court concluded there was no direct evidence to support a finding the mother knew or should have known her baby was being abused. (*Id*. at pp. 1292–1293.)

Here, unlike the mother in *L.Z.*, mother reasonably should have known that her child was being physically abused. The department submitted evidence showing that the child suffered at least three instances of abuse over a period of weeks and had sustained obvious, visible injuries as a result of this abuse. According to the nurse practitioner who evaluated the child at OCH, the child would have displayed very clear signs that she was seriously injured. The nurse practitioner further indicated that the injuries to the child's ribs and legs were each in different stages of healing and caused by a violent physical assault.

Parents fulfilling their proper role of providing safety and protection to their child would have reasonably known that their child was being subjected to abuse under such circumstances. However, mother waited more than 10 days to seek medical treatment after she was first informed of the child's pain, and she unreasonably failed to prevent a convicted child abuser from having unsupervised access during that time period. Furthermore, testimony of mother's friend revealed that the child's leg was actually swollen for several days before the parents brought the child to the pediatrician's office.

As the juvenile court pointed out, mother knew of E.M.'s prior conviction for abusing his own child, allowed him repeated and unsupervised access to her children, and failed to take any protective action despite awareness of the child suffering pain in the

17.

weeks prior to the child's removal. In light of this evidence, the juvenile court could reasonably infer that mother knew or reasonably should have known of E.M.'s propensity for abuse and his actual abuse of the child. (See *In re E.H.*, *supra*, 108 Cal.App.4th at pp. 669–670 [where infant suffered severe physical abuse and had been cared for only by family members, the only reasonable conclusion to be drawn from the evidence was that the parent knew or should have known the infant was being harmed by someone in the home].)

Further, the juvenile court expressly found that mother's statements about her limited knowledge of E.M.'s child abuse conviction, the child's lack of pain prior to the doctor visit, and discussions of the child's injuries with E.M. were not credible. Under such circumstances, we can find no fault with the juvenile court's rejection of mother's claimed ignorance of the abuse in the weeks prior to the child's removal. (See *In re Sheila B.* (1993) 19 Cal.App.4th 187, 200 [" 'Issues of fact and credibility are questions for the trial court.' "].)

Finally, the problem mother faces on the issue of whether services would prevent reabuse is that she stands in the position of one who had the burden of proof in the juvenile court. When "the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) In order to find error, this court would have to conclude that mother presented competent testimonial evidence that compelled a finding that reunification services were likely to prevent the child's reabuse. Mother, however, did not present any evidence that reunification services were likely to prevent the child's reabuse. The fact that mother briefly participated in counseling and only recently began a parenting class would not compel such a finding. Thus, she failed to carry her burden of proof in the juvenile court and on appeal.

## DISPOSITION

The petition for extraordinary writ is denied. This court's opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A).